2026 IL App (1st) 240362-U

SECOND DIVISION
July 28, 2026

No. 1-24-0362

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22CR9325 |
| | ) | |
| REGGIE DUGAR, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) The trial court did not abuse its discretion in allowing defendant's prior conviction to be used for impeachment; (2) the trial court did not abuse its discretion in allowing the victim's wife to testify about defendant's actions; and (3) defendant's 16-year sentence is not excessive.

¶ 2    Following a jury trial, defendant Reggie Dugar was convicted of aggravated battery with a firearm stemming from the May 2022 shooting of Preston Ralford. The trial court subsequently sentenced defendant to a term of 16 years in the Illinois Department of Corrections (IDOC).

¶ 3      On appeal, defendant argues that: (1) the trial court erred in allowing the State to introduce defendant's prior conviction of unlawful use of a weapon by a felon (UUWF) for impeachment purposes; (2) the trial court erred in allowing Ralford's wife to provide improper lay opinion testimony about defendant's actions; and (3) his 16-year sentence is excessive.

¶ 4      In August 2022, defendant was charged by indictment with three counts of attempted first degree murder, one count of aggravated battery with a firearm, and one count of UUWF. The UUWF charge was severed from the other charges prior to trial and later dismissed by the State.

¶ 5      Prior to trial, defendant moved to admit evidence of Ralford's "aggressive nature," pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), in support of defendant's claim of self-defense. Under *Lynch*, evidence of a victim's aggressive and violent character may be admitted to support a theory of self-defense in two ways: (1) the defendant's knowledge of the victim's violent tendencies necessarily affects the defendant's perceptions of and reactions to the victim's behavior, and (2) evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. *Id*. at 199-200. Defendant sought to admit evidence about an incident from June 2021 in which Ralford got into a verbal altercation with Lemarr Allen and later threatened Allen with a firearm. The trial court granted defendant's motion.

¶ 6      The State later filed a motion *in limine* requesting to admit evidence of defendant's 2012 UUWF conviction to be admitted for impeachment purposes if defendant testified at trial, under *People v. Montgomery*, 47 Ill. 2d 510 (1971). The supreme court in *Montgomery* held that, with certain restrictions, the State may introduce a defendant's prior conviction to attack the defendant's credibility. *Id*. at 516-19; see Ill. R. Evid. 609(b) (eff. Jan. 1, 2011). In its motion, the State noted that defendant's release from custody following this conviction was within 10

years. Defense counsel opposed the motion and argued that the prejudicial effect of the prior UUWF conviction would outweigh any probative value. Counsel further argued that this evidence could impermissibly influence the jury that, based on defendant's history, he was guilty of the offenses at issue. The trial court granted the State's request to admit this conviction and made several findings on the record. The court first observed that the conviction fell within the time frame for admissibility. The court then addressed the potential prejudicial effect, finding it was not "unduly prejudicial" and it was appropriate for the jury to consider the prior conviction in assessing defendant's credibility. The court also indicated it would provide a limiting instruction to the jury that the prior conviction could only be considered for defendant's credibility and not as substantive evidence.

¶ 7    The following evidence was presented at defendant's November 2023 jury trial.

¶ 8    Preston Ralford testified that on the afternoon of May 22, 2022, he and his family went to the Little Caesars pizza restaurant, located at West 79th Street and South Exchange Avenue in Chicago. He drove a minivan, with his wife Infiniti Ralford in the front passenger seat and their four children, ranging in age from 11 months to 11 years old, in the back of the van. The parking lot was crowded with several cars coming and going. He waited but then pulled into the lot and double parked behind another vehicle. According to Ralford, "nobody really parks" in that lot and people "will pull in there" and "hop out." He double parked because it usually did not take him long to go into Little Caesars and get his pizza. When Ralford exited his van, a man behind him said, "are you good" and Ralford waved the man off and indicated he was "good." Ralford then walked into Little Caesars. Nothing else was said between the men. Ralford did not identify that man in court as defendant, but it is not disputed that the defendant walked into the restaurant behind Ralford.

¶ 9     When Ralford entered Little Caesars, defendant walked in and bumped Ralford. Ralford told him, "everybody don't play like that." Defendant then raised his hands with the palms facing forward. Ralford was texting on his phone when defendant left the restaurant. Ralford then heard a horn "blowing" and walked outside without ordering food. His wife was yelling from the van window as Ralford walked toward her in the van. Infiniti told Ralford to "see what he got." As he walked toward his wife, Ralford was shot. The last thing he remembered seeing was the back of his van. He did not see the shooter at the moment he was shot. Ralford fell to the ground and his wife exited the van and came to him.

¶ 10     With her help, Ralford was able to get back into the van. He was in the passenger seat and Infiniti drove them to the hospital. Because that hospital was unable to treat him, Ralford was placed in an ambulance and he has no recollection of what happened next. He remembers lying in the hospital before being taken to a room while his wife was crying. He was treated at the University of Chicago Medical Center where Ralford learned that he had bullet wounds in all four of his limbs and his right lung. His medical treatment included the insertion of a metal rod into his left leg and the placement of three screws into his right buttock. A bullet went through his left arm and caused nerve damage. Another bullet remains lodged in his right arm. He also testified that a bullet lodged in his left leg was due to be removed soon. He stayed in the hospital for several weeks and was discharged to a rehabilitation center for 30 days. These injuries prevented Ralford from returning to his job working in operations at the Chicago Transit Authority.

¶ 11     Ralford denied engaging in a conversation with defendant while in the Little Caesars restaurant. According to Ralford, he walked out after defendant, but his leaving had nothing to do with defendant. He did not recall if he told the police that he left because he heard honking

from the parking lot. He admitted that when he raised his arms "straight perpendicular" to his body, he was holding his cell phone. He had been talking to his wife as he walked toward her in the van.

¶ 12     Following a sidebar, the trial court found defendant had set forth the minimum amount of testimony to allow the *Lynch* evidence to be presented. Defense counsel then questioned Ralford about an incident that occurred on June 24, 2021, at a Family Dollar store, located on West 79th Street. Ralford had been at the laundromat next door, then left and went into the Family Dollar store. He encountered Lemarr Allen, who was staring at Ralford. Ralford said the incident was not a "big deal" and denied telling Allen that he was going to get his gun. Ralford stated he told Allen he would be back and left the store. Ralford left because Allen and other employees were gathering around Ralford. Allen threw a bucket and challenged Ralford to a fight. Ralford then left the store and denied returning with a gun in his waistband. He also denied calling his friend Frank Williams to come to the store because Williams was already on his way. Ralford denied that Williams was waving a gun in the parking lot. Ralford was detained and arrested by the police but maintained that he did not possess a gun that day. On redirect, Ralford stated that he was never convicted of any crime related to the Family Dollar incident.

¶ 13     The parties stipulated to the admission of multiple video recordings taken from different businesses in the strip mall on the 7900 block of South Exchange Avenue. The first video was from a business known as The Connection. After a portion of the video was played, Ralford testified that he could not see faces, but identified his minivan and said he was the individual who fell to the ground behind the minivan. The second video, from AB Food and Liquor, showed the same scene, but "slightly closer." Ralford identified a silver sport utility vehicle

(SUV) parked in the lot and the man seen exiting that vehicle wearing a gray shirt and gray hat was the person with whom Ralford had the altercation.

¶ 14    The next two recordings were surveillance videos from Little Caesars, both inside and outside the restaurant. Ralford testified that as he walked out of the Little Caesars restaurant, he only had his cell phone in his hand. He denied making any verbal threats to anyone and was talking to his wife. He did not see defendant pull the trigger.

¶ 15    Infiniti Ralford testified that on May 22, 2022, she and her husband were taking their four children to the beach. Ralford drove them to a Little Caesars while on the way. According to Infiniti, they had a hard time entering the parking lot. Ralford encountered defendant after parking the car. Infiniti identified defendant in court as the man from the parking lot. She saw defendant on the driver's side of the van. After Ralford exited the van, Infiniti saw defendant "reach his hand out and say [are] you good." Infiniti then stated that defendant reached toward his back for a weapon with his left hand. Ralford responded that he was good. No more words were exchanged between the men as defendant walked around the front of the van and Ralford walked around the back. Infiniti stated defendant appeared to look into the window of the van at her and the children.

¶ 16    She saw Ralford enter the Little Caesars with defendant following right behind him. As they were walking into the restaurant, she heard defendant say, "you good," a few more times, but Ralford ignored him and asked defendant to leave him alone. Infiniti remained in the van while Ralford was inside the restaurant, but she was able to see inside through the windows. She said defendant appeared to bump into Ralford as they entered. Defendant then stepped to the side. She did not see anything else because a woman exited the restaurant. The woman spoke to Infiniti and based on what she said, Infiniti honked the horn to get Ralford's attention. She then

saw defendant exit the restaurant and while walking out, Infiniti observed him "reaching to his back preparing himself." She did not see defendant's hands again until after the shooting.

¶ 17     Ralford walked out after defendant and Infiniti was trying to warn her husband about him. At that time, Infiniti had her phone in her hand and took a picture of defendant. While she was talking to Ralford, defendant walked toward the front of the van, stopped midway, and started shooting at Ralford. She denied that Ralford said anything to defendant and she testified that Ralford did not have a gun or any other weapon that day. After the shooting, Infiniti helped her husband get into their car. She then drove to the hospital. Before she left, Infiniti saw defendant walking around them with "his chest puffed up kind of halfway stomping around us."

¶ 18     This court has viewed the surveillance videos and the evidence speaks for itself. We note the surveillance videos from Little Caesars clearly corroborated Ralford's testimony that he had a cell phone in his right hand. He was using his cell phone while inside Little Caesars and it remained in his right hand when he was outside as well. When Ralford was shot, the phone fell from his hand and Ralford's wife is seen picking up the phone when she helped Ralford into the van. The outside surveillance video also showed a woman exit Little Caesars, walk through the parking lot, and then turn around and appear to address Infiniti seated in the van. This woman then left.

¶ 19     The parties stipulated that if called to testify, Chicago Police Officer Tania Morin would testify that she is employed as an evidence technician. On May 22, 2022, she went to the location on the 7900 block of South Exchange Avenue and recovered four fired cartridge casings for a 9-millimeter handgun. She also photographed and swabbed a suspected blood stain from the pavement of the parking lot.

¶ 20    Chicago Police Detective Donald Yurisich was assigned to investigate the May 22, 2022, shooting on the 7900 block of South Exchange Avenue. When he arrived, neither the victim nor the offender was at the scene. He spoke with officers at the scene and viewed a video recorded by an officer from a monitor at one of the stores. The video showed defendant exit a gray Mitsubishi and Ralford exit from a van. They walked through the parking lot after exchanging words, entered Little Caesars, and then walked out moments later. As they walked out in separate directions, Ralford was walking toward his van when defendant pulled a firearm from his waistband and fired four times at Ralford. During the course of the investigation, Detective Yurisich identified the shooter as defendant.

¶ 21    The detective later reached out to Ralford and his wife and conducted separate photo arrays with them on June 7, 2022. Infiniti identified defendant, but Ralford did not identify the defendant. Detective Yurisich interviewed both Ralford and Infiniti separately at the police station. He admitted that Ralford did not tell him that his wife had been honking the horn outside. He also admitted that Infiniti did not tell him that Ralford put his hands up or that defendant looked into the window of the van. The detective testified his report stated that Ralford told him that Ralford had exited Little Caesars before defendant.

¶ 22    Defendant was subsequently arrested and Detective Yurisich interviewed him at the police station. He identified defendant in court as the person identified in the photo and in custody. The interview between the detective and defendant was recorded and played at trial.

¶ 23    In the video, Detective Yurisich informed defendant of his *Miranda* rights and defendant agreed to answer questions. When asked about what occurred near 79th and Exchange on May 22, 2022, defendant did not remember what was at that location, including the Little Caesars restaurant, until reminded by the detective. Defendant stated that nothing happened at that

location. Detective Yurisich asked defendant if he exchanged words with someone in the parking lot and later inside Little Caesars. Defendant responded he put his "hands up" and said he did not want any problems. Defendant added that he was followed when he left Little Caesars, he heard gunshots, but did not see anything because it was dark outside. The detective then told defendant that it was not dark outside because this incident occurred at 3:40 p.m. in the afternoon. Defendant said he "got low" when he heard the gunshots and fled. Detective Yurisich then asked why words were exchanged with the other man in the parking lot and defendant responded that he had "no idea" and had never seen the man before. Defendant said the other man had "an entourage" and there were males in the van. Defendant decided to leave Little Caesars without ordering because the other man keep talking to him and was "going off." The man then followed defendant out of the restaurant and to the car. Defendant stated that he did not want any problems and "just wanted to get something to eat." The man was getting aggressive and then defendant heard gunshots. At the conclusion of the interview, Detective Yurisich informed defendant that he had been identified as the person who fired the gunshots and then concluded the interview.

¶ 24    Defendant presented the testimony of Lemarr Allen. Allen stated that at 8:30 p.m. on June 24, 2021, he was at the Family Dollar store, located at 160 West 79th Street. He identified a photograph of Ralford as the person with whom he had an altercation. While Allen was in line behind Ralford at the Family Dollar store, Ralford was "constantly" turning around to look at him. This made Allen uncomfortable and Allen asked Ralford if he could help him with something. Ralford accused Allen of following him in the store. Allen denied following Ralford, did not know Ralford, and had no reason to follow him. Ralford was "very adamant" that Allen had been following him. Ralford "got a little violent and he said he would get a gun." Ralford then ran out of the store and did not pay for his items.

¶ 25    Allen also testified that the manager of the store was trying to stop the altercation and subsequently called the police. Ralford appeared again with a gun and the manager locked the door. Allen said he saw the gun in Ralford's waistband. Ralford approached and asked Allen to come outside. According to Allen, Ralford called someone on his phone, telling the person that Ralford was having problems with somebody at the Family Dollar store. About two minutes later, another individual arrived and also had a gun that he was waving. The police arrived two minutes later and followed Ralford's friend who ran down the block. Ralford hid his gun in the car, walked away, and went into the laundromat. Allen and the store manager directed the officers to the laundromat where Ralford was taken into custody. Allen testified that he never went to court for this case. He said he went to the police station and was told the police did not have a record of an arrest.

¶ 26    Defendant testified that on May 22, 2022, defendant drove with a friend and her daughter to Little Caesars to get something to eat. When he arrived, he backed into a space in the parking lot. A van then "darted" in front of his vehicle and blocked him into the spot. He identified the driver as Ralford. When defendant exited the car, he spoke to Ralford and asked him if he was "good, meaning is everything okay." Both men then walked to Little Caesars. Defendant tried to walk in but Ralford was blocking the door. Defendant tried to "slide" past and not bump Ralford, who then shoved defendant. Defendant walked past Ralford and indicated that he did not want any problems and put his hands up. According to defendant, Ralford was "in a rage" and was telling defendant that he was going to call his people to come there and "F [him] up." Defendant decided to leave and go somewhere else. He then exited the restaurant.

¶ 27    After defendant left, he heard the door open and he looked back to see that Ralford had exited. As defendant walked away, he heard Ralford say that he was not going to move and his

"homies" were going to kill defendant. Defendant believed Ralford was serious and saw something in his hand that appeared to be a gun. Defendant was carrying a weapon, he pulled it out and fired. Defendant was trying to disarm Ralford because he was in fear for his life. Defendant went to the car and made sure his friend and her daughter were okay. He walked away from the scene because he was afraid after hearing Ralford on his phone say, "that people were coming."

¶ 28    Defendant admitted that he denied being the shooter in his July 2022 interview with Detective Yurisich. He testified he was afraid of what was going to happen. He also admitted that he was carrying a firearm that day because he wanted to protect himself. Defendant said he made efforts to de-escalate the situation by asking if Ralford was "good," putting up his hands, and leaving Little Caesars. After playing clips from the surveillance video of the shooting, defendant agreed that Ralford was walking toward him and not toward the back of the van. Defendant also admitted that he had a prior felony conviction for UUWF.

¶ 29    During cross-examination, defendant conceded he told the detective that Ralford had an "entourage" with him. Defendant denied being able to see who was in Ralford's van. When he walked by Ralford's van, he "glanced" inside and saw an adult female in the passenger seat. He also saw that there were other "figures" in the back but he could not tell their sizes because the windows were tinted. Defendant was concerned that whoever was in the van could "back up" Ralford. Defendant did not have time to determine whether Ralford was holding a cell phone rather than a gun. Defendant testified that he first started to fear for his life when Ralford double parked in front of defendant's vehicle.

¶ 30    Following defendant's testimony, the State requested to admit defendant's 2012 certified statement of conviction for UUWF, which the trial court admitted. With that, the State rested in rebuttal.

¶ 31    Thereafter, the jury found defendant guilty of aggravated battery with a firearm and not guilty of attempted first degree murder. Defendant's motion for a new trial included the following: (1) the trial court erred in admitting defendant's prior UUWF conviction because it was unfairly prejudicial and (2) Infiniti's testimony that defendant was "preparing himself" was improper speculation. Defendant's motion was denied.

¶ 32    The court sentenced defendant to a term of 16 years in the IDOC after hearing arguments from both parties, reviewed defendant's presentence investigation (PSI), as well as character letters and certificates for classes.

¶ 33    Defendant first argues the admission of his prior UUWF conviction for impeachment was unduly prejudicial. The State responds the trial court properly conducted the balancing test when it concluded the probative value of defendant's conviction outweighed any prejudice because his credibility was a central issue at trial.

¶ 34    As we previously observed, in *Montgomery*, the supreme court delineated the admissibility of prior convictions for impeachment. For the purposes of attacking credibility, evidence of a prior conviction is admissible if: (1) the crime was punishable by death or imprisonment for more than one year, or the crime involved dishonesty or false statement regardless of the punishment; (2) less than 10 years have elapsed since either the conviction or the witness's release from confinement, whichever is later; and (3) the probative value of the conviction outweighs the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516.

¶ 35    The third factor requires the trial court to perform a balancing test, weighing the prior

conviction's probative value against its potential prejudice. *People v. Mullins*, 242 Ill. 2d 1, 14 (2011). In conducting this test, the court should take into consideration factors such as the nature of the prior offense, its recency and similarity to the present charge, the length of the criminal record, and the age and circumstances of the witness. *Id*. at 14-15. If the trial court determines that the prejudice substantially outweighs the probative value of admitting the evidence, then the evidence of the prior conviction must be excluded. *Id*. at 15. "The trial court is given wide latitude in determining whether the probative value of admitting a particular conviction outweighs any unfair prejudice to defendant." *People v. Williams*, 2015 IL App (1st) 130097, ¶ 48.

¶ 36    The determination of whether a witness's prior conviction is admissible for impeachment purposes is within the discretion of the trial court. *Mullins*, 242 Ill. 2d at 15. An abuse of discretion arises only when the trial court's ruling is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. Sloan*, 2024 IL 129676, ¶ 15.

¶ 37    Here, defendant admits that his 2012 UUWF conviction satisfies the first two requirements set forth in *Montgomery*. He limits his challenge to whether the prejudicial effect of this conviction outweighed its probative value. According to defendant, the UUWF conviction is similar to the charged offense of aggravated battery with a firearm because both are at least partly weapons offenses. He continues by noting that a key element of both charges requires at the very least, the use or possession of a weapon. He contends that this similarity warranted the trial court to exercise more caution in allowing the admission of defendant's prior conviction, which the court failed to do. Defendant also asserts that the danger of unfair prejudice was exacerbated in this case because the prior conviction of UUWF informed the jury that defendant

had at least one additional felony conviction.

¶ 38    The State responds the trial court properly admitted defendant's prior conviction because his credibility was at issue in his self-defense claim. The State adds the jury was instructed that the prior conviction could only be considered for defendant's credibility and not as substantive evidence.

¶ 39    In a pretrial hearing, the trial court performed the *Montgomery* test before concluding that defendant's prior UUWF conviction was admissible for impeachment. The court discussed the pending charges of attempted first degree murder and aggravated battery with a firearm and observed that those charges made the court "stop and take a clear look at those charges to see what prejudicial effect it would have." The court also noted that the UUWF conviction was "a weapons offense" but was "not a conviction where the defendant is alleged to have shot at anybody or shot somebody. It's a distinct key feature[] from the charges against this defendant." Regarding the aggravated battery charge, the court specifically found that it would not be unduly prejudicial and was "appropriate should the defendant choose to testify and put his credibility at issue before the jury." The court added that it would instruct the jury not to consider the prior conviction for any purpose other than weighing defendant's credibility.

¶ 40    At the conclusion of the evidence, the trial court instructed the jury in accordance with Illinois Pattern Jury Instructions, Criminal, No. 3.13 (approved Oct. 17, 2014), as follows:

>            "Evidence of the defendant's previous conviction of an offense may be
>        considered by you only as it may affect his believability as a witness and must not
>        be considered by you as evidence of his guilt of the offense with which he is
>        charged."

"Absent some indication to the contrary, we must presume that jurors follow the law as set forth

in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49. Defendant has not suggested that the jury failed to follow the instructions as given.

¶ 41    We find the holding in *People v. Williams*, 2015 IL App (1st) 130097, to be analogous to the facts here. There, the defendant was charged with aggravated discharge of a firearm and the State sought to introduce a prior conviction for UUWF. *Id*. ¶ 3. The trial court allowed the prior UUWF to be admitted as impeachment evidence following the defendant's testimony. *Id*. The defendant argued on appeal, in relevant part, that it was prejudicial to disclose his previous firearm related conviction because of its similarity to the offense on trial since "evidence of similar offenses creates pressure for the jury to believe that 'if he did it before he probably did so this time.' " *Id*. ¶ 50.

¶ 42    The reviewing court observed that while convictions for the same crime should be admitted sparingly, a court is not barred from admitting the same or similar prior convictions for impeachment purposes. *Id*. "Further, our supreme court has acknowledged that where the defendant's testimony makes up his entire defense, as it did here, his credibility is a central issue and admission of prior convictions is crucial in measuring the defendant's credibility." *Id*. (citing *People v. Atkinson*, 186 Ill. 2d 450, 462 (1999)). The *Williams* court concluded that the trial court did not abuse its discretion in admitting the prior UUWF conviction "as it was not unreasonable for the court to find that the conviction was probative of defendant's credibility in this case." *Id*.

¶ 43    We agree with the analysis in *Williams* and reach the same conclusion here. The record clearly shows that the trial court considered the prejudicial effect of admitting the prior UUWF but found it did not outweigh its probative value. The court observed some similarities in the UUWF and present offenses, in that both involved weapons, but noted the UUWF only involved

possession and did not allege that defendant fired the weapon. As pointed out above, the court found this to be a key distinction between the prior UUWF and the present charges.

¶ 44    The court also instructed the jury that defendant's prior conviction could only be considered for his credibility, not as evidence of guilt. "The prejudicial effect of admitting similar or identical offenses is diminished where, as here, the jury receives a limiting instruction on its use of the earlier conviction." *People v. Barner*, 374 Ill. App. 3d 963, 972 (2007) (citing *Atkinson*, 186 Ill. 2d at 463). It is clear the trial court sufficiently weighed the prejudicial effect against the probative value and concluded it was appropriate for the jury to consider the prior UUWF in assessing defendant's credibility. Accordingly, we find no abuse of discretion.

¶ 45    Defendant also asserts that if this court finds the trial court erred in allowing his prior conviction for impeachment purposes, then we should find the error was not harmless. However, because we have found that no error occurred, we need not consider whether the alleged error was harmless. See *People v. Nash*, 2012 IL App (1st) 093233, ¶ 33 (where no error is found, the court "need not engage in a harmless error analysis").

¶ 46    Next, defendant contends that the trial court erred in admitting improper lay opinion testimony from Infiniti Ralford when she testified that defendant was "preparing himself" before the shooting occurred. The State maintains that Infiniti's testimony was proper lay opinion based on her perception of the events. The State alternatively argues that any alleged error was harmless.

¶ 47    Under Illinois Rule of Evidence 701, a lay witness may offer testimony "in the form of opinions or inferences" that are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ill. R. Evid. R 701 (eff. Jan 1. 2011). However, lay witness testimony must be limited to

statements of fact based on the witness's personal knowledge. *People v. McCarter*, 385 Ill. App. 3d 919, 934 (2008). While a lay witness may testify to her observations or sensory perceptions, she generally may not give her opinions or interpretations of those observations. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 41. We review a trial court's decision on whether to admit lay witness opinion testimony for an abuse of discretion. *People v. Spears*, 2024 IL App (1st) 181491, ¶ 189.

¶ 48    Defendant admits that Infiniti's testimony was appropriate as to what she saw but exceeded the scope of her perceptions when she testified that defendant was "reaching to his back preparing himself." According to defendant, Infiniti's opinion of what defendant was doing was not helpful to the jury because it did not clarify any part of her testimony or help the jury determine an issue of fact. He further asserts that her opinion testimony "significantly undermine[d]" the jury's ability to interpret Infiniti's testimony and reach its own conclusion about defendant's intent.

¶ 49    The State responds that Infiniti's testimony was rationally based on her observation that defendant reached behind his back immediately before he produced the gun and shot Ralford. The State maintains this statement aided the jury in determining whether defendant was justified in his actions. We agree.

¶ 50    When Infiniti's testimony is read in context with other evidence, it is clear she was recounting what she observed just before defendant fired a gun at her husband. Significantly, defendant admitted at trial that the surveillance video showed him reaching behind his back for his firearm while he was walking between two parked cars after he exited the restaurant. This admission supported Infiniti's observation and testimony.

¶ 51    A lay witness may provide an opinion on the ultimate issue in a case because "the trier of

fact is not required to accept the witness' conclusion and, therefore, such testimony cannot be said to usurp the province of the jury." *People v. Terrell*, 185 Ill. 2d 467, 496-97 (1998); see *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 86 ("It is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence."). Infiniti provided her opinion based on her own observations of defendant and it was the role of the jury to determine whether Infiniti's testimony accurately reflected the circumstances based on the totality of the evidence. The trial court did not abuse its discretion in allowing Infiniti's lay opinion testimony describing defendant's actions.

¶ 52    However, even if this testimony was inadmissible, any error was harmless. "An error can be harmless (1) where the error did not contribute to defendant's conviction, (2) where the other evidence overwhelmingly supports defendant's conviction, or (3) where the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Colone*, 2024 IL App (1st) 230520, ¶ 101 (citing *In re Brandon P.*, 2014 IL 116653, ¶ 50). Here, all three prongs apply because (1) considering the video evidence, which was admitted without objection, Infiniti's testimony did not contribute to the conviction; (2) the surveillance video clearly depicts the shooting and overwhelmingly supports defendant's conviction; and (3) Infiniti's testimony is cumulative to the video which showed defendant reach behind his back for his firearm, as well as defendant's own testimony admitting as such. Given this video evidence, Infiniti's brief statement that defendant was "preparing himself" was harmless beyond a reasonable doubt.

¶ 53    Defendant further asserts that the prejudicial impact of Infiniti's statement was compounded by the State's use of her testimony in closing argument. Generally, prosecutors have wide latitude in presenting their closing arguments and may comment on the evidence, as

well as make any fair and reasonable inferences from the evidence. *People v. Jackson*, 2020 IL 124112, ¶ 82. During closing argument, the prosecutor was replaying the surveillance video and recounting defendant's actions, including referencing Infiniti's testimony. As Infiniti's testimony was not error, neither is this argument by the prosecutor. The prosecutor properly argued what the video showed and emphasized defendant's own actions. No error occurred in this argument.

¶ 54    Finally, defendant argues that his 16-year sentence was excessive because he demonstrated his rehabilitative potential in his work experience and his predominantly nonviolent criminal history, and the trial court failed to consider defendant's self-defense claim as mitigation. The State responds that the trial court properly considered the relevant aggravating and mitigating factors before imposing defendant's sentence.

¶ 55    "It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant." *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). The appellate court generally affords great deference to a trial court's sentencing decision because the trial court is in a better position to determine the appropriate sentence. *Id*. In crafting a sentence, the trial court has the ability to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A reviewing court may not reverse the sentencing court simply because it would have weighed the factors differently. *Id*. at 213. A trial court's sentencing decision will not be overturned absent an abuse of discretion. *Id*. at 212. "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id*. (quoting *People v. Stacey,* 193 Ill. 2d 203, 210 (2000)).

¶ 56    Defendant was convicted of aggravated battery with a firearm, a Class X felony. 720

ILCS 5/12-3.05(e)(1), (h) (West 2020). The sentencing range for a Class X felony is 6 to 30 years. 730 ILCS 5/5-4.5-25(a) (West 2020). Defendant's 16-year sentence is well within the appropriate sentencing range. A sentence imposed within the statutory range is presumed to be proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 57    Nevertheless, defendant contends that the court did not give adequate consideration to his rehabilitative potential, as well as his long history of steady employment. Rather, he asserts the trial court erred by focusing on the seriousness of the offense and defendant's criminal history, which primarily consisted of misdemeanors and nonviolent felonies. Defendant's PSI listed numerous prior criminal convictions for felonies and misdemeanors, including at least two prior felonies with time spent in the IDOC. The PSI also disclosed that defendant was employed as a machine operator for General Packaging Products at the time of his arrest. He previously spent two years employed as a forklift operator for Freedman Seating Company. He also has a daughter and was paying child support for her care.

¶ 58    In allocution, defendant stated that he "was just minding [his] business" and he tried to "avoid" and de-escalate the situation. He attempted to walk away, which he stated was on the video. He also noted that he has a family and would like to get home to them as soon as possible.

¶ 59    At the hearing, the trial court found that defendant was not justified in shooting Ralford in the parking lot outside Little Caesars, noting that defendant was not legally allowed to possess the firearm. The court observed that defendant "demonstrated just how dangerous [he is] when [he is] in conflict" and the shooting occurred in "broad daylight" in a busy strip mall with women, children, and families present. Before imposing the sentence, the court explicitly stated that it:

"considered the pre-sentence investigation report, statement in allocution, the

20

evidence that was attached and submitted by your attorney regarding what you

have done with your time while incarcerated. I have considered the arguments of

the attorneys, all the statutory and nonstatutory factors in mitigation and

aggravation, whether or not they were specifically mentioned by your lawyer or

the State."

¶ 60 The court further indicated that it considered defendant's history. After taking all evidence into account, the court concluded, based on "the nature of this shooting, the seriousness of the offense, and still considering a sentence that would restore you at some point to useful citizenship," the appropriate sentence was 16 years.

¶ 61 The record clearly shows the trial court fully considered the evidence in aggravation and mitigation alongside the facts of the case before imposing a sentence it believed was appropriate for the seriousness of the crime. The court considered defendant's age, his criminal history, work, and family. Defendant's sentence was well below the maximum of 30 years in prison. While defendant sought a sentence closer to the lower end of the range, the trial court entered a sentence within the middle of the statutory guidelines. Based on our review of the record, we find that the trial court did not abuse its discretion in sentencing defendant to a term of 16 years.

¶ 62 Based on the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 63 Affirmed.